Michael R. Reese
*mreese@reesellp.com*
George V. Granade
*ggranade@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York  10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAWRENCE WEINBERGER *and* LAURIE WEINBERGER, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>– against –<br><br>MOVIEPASS INC.,<br><br>Defendant. | Case No. 1:19-cv-01039<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Lawrence Weinberger and Laurie Weinberger (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), by and through their undersigned counsel, bring this Class Action Complaint against MoviePass Inc. ("MoviePass" or "Defendant") and respectfully allege as follows. Plaintiffs base the allegations herein on personal knowledge as to matters related to, and known to, Plaintiffs. As to all other matters, Plaintiffs base the allegations on information and belief, through investigation of Plaintiffs' counsel. Plaintiffs believe substantial evidentiary support exists for the allegations below, and they seek a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a proposed class action against MoviePass, a discount movie ticket service, for engaging in a deceptive and unfair bait-and-switch scheme. MoviePass led consumers to purchase subscriptions (the "MoviePass Subscriptions" or "Subscriptions") that it claimed would allow the consumers to have "unlimited" access to tickets to movies playing in theaters, or would allow the consumers to purchase a ticket to "any movie" in "any theater" on "any day," up to one movie per day. Defendant's representations about the Subscriptions were false and misleading, however, because the Subscriptions did not provide "unlimited" access to movie tickets and did not provide access to tickets to "any movie" in "any theater" on "any day." Instead, Subscription purchasers routinely could not use their Subscriptions to obtain tickets to any movies, were faced with only a limited selection of movies, showtimes, and theaters, or otherwise experienced significant difficulty in obtaining movie tickets through their Subscriptions.

2.      Plaintiffs bring this action individually and on behalf of the Class members to stop Defendant's unlawful practices, seeking monetary and injunctive relief and such further relief as the Court may deem just and proper.

1

## PARTIES

### Plaintiff Lawrence Weinberger

3.      Plaintiff Lawrence Weinberger resides in Sea Cliff, New York, and he has no intention of changing his residence.

4.      Plaintiff Laurie Weinberger is Lawrence Weinberger's wife.

5.      On or about March 31, 2018, Mr. Weinberger purchased a one year MoviePass Subscription for $105.35. Mr. Weinberger paid for the full year at the time of purchase.

6.      After Mr. Weinberger purchased a Subscription, MoviePass sent him a card that is similar to a debit card or credit card (the "MoviePass Card"), which he could use to purchase movie tickets that were paid for through his MoviePass Subscription at theaters.

7.      Mr. Weinberger also downloaded and installed Defendant's application (the "MoviePass App" or the "App") on his smartphone.

8.      Mr. Weinberger used the MoviePass App to search for movie tickets that he could purchase through his MoviePass Subscription.

9.      Prior to purchasing a MoviePass Subscription, Mr. Weinberger visited MoviePass's homepage, on which he saw Defendant's representation that its Subscription service would provide access to tickets to "any movie" in "any theater" on "any day."

10.     Prior to purchasing a MoviePass Subscription, Mr. Weinberger also saw Defendant's representation that a MoviePass Subscription would provide him with "unlimited" access to tickets to movies in theaters.

11.     Prior to purchasing a Subscription, Mr. Weinberger believed that a Subscription would provide him access to tickets to "any movie" in "any theater" on "any day," up to one movie per day. He believed he could use the Subscription to obtain "unlimited" tickets to movies in

theaters, up to one movie per day.

12.    Mr. Weinberger relied upon Defendant's "any theater, any movie, any day" representation and its "unlimited" representation in making his decision to purchase a full year MoviePass Subscription for $105.35, and he would not have purchased the Subscription had he known that, in fact, the Subscription would not provide him with access to "any movie" in "any theater" on "any day" and would not provide him with "unlimited" access to tickets, and that, instead, he would routinely be unable to obtain access to Subscription-based tickets to any movie playing in a theater.

13.    Mr. Weinberger paid for a MoviePass Subscription that provided access to "any movie" in "any theater" on "any day" and provided "unlimited" access to tickets, but he received a Subscription that did not provide him access to "any movie" in "any theater" on "any day" or "unlimited" access to tickets. Rather, the Subscription Mr. Weinberger received routinely failed to provide him access to tickets to any movie playing in a theater.

14.    The MoviePass Subscription that Mr. Weinberger received was worth less than the Subscription for which he paid. Mr. Weinberger was injured in fact and lost money as a result of Defendant's improper conduct.

15.    As of February 1, 2019, Mr. Weinberger has seen a total of three movies using his MoviePass Subscription: one in May 2018, one in July 2018, and one in October 2018.

16.    On numerous occasions, Mr. Weinberger was unable to see any movie using MoviePass, although he tried to do so. When he searched for tickets using the MoviePass App, the App would require Mr. Weinberger to select potential theaters. After he had selected theaters, the App would state that "there are no more screenings at this theater today," even when Mr. Weinberger had selected up to four potential theaters. The MoviePass App routinely gave Mr.

Weinberger the message "there are no more screenings at this theater today" in response to his searches at various times throughout the day, including early morning, mid-morning, afternoon, and evening.

17.     Mr. Weinberger could not obtain a refund if he attempted to cancel his Subscription prior to the end of the one year period because MoviePass does not offer pro-rated refunds to annual subscribers.

18.     Mr. Weinberger would purchase another "unlimited" MoviePass Subscription in the future, if it were true that the Subscription would provide him with unlimited access to tickets to movies in theaters, i.e., access to tickets to any movie in any theater on any day. At present, however, Mr. Weinberger cannot be confident that a MoviePass Subscription would provide him with "unlimited" access to tickets to movies in theaters or with the ability to purchase tickets to "any movie" in "any theater" on "any day."

**Plaintiff Laurie Weinberger**

19.     Plaintiff Laurie Weinberger resides in Sea Cliff, New York, and she has no intention of changing her residence.

20.     On or about March 31, 2018, Mrs. Weinberger also purchased a one year MoviePass Subscription for $105.35. Mrs. Weinberger paid for the full year at the time of purchase.

21.     After Mrs. Weinberger purchased a Subscription, MoviePass sent her a MoviePass Card.

22.     Mrs. Weinberger downloaded and installed the MoviePass App on her smartphone.

23.     Mrs. Weinberger used the MoviePass App to search for movie tickets that she could purchase through her MoviePass Subscription.

24.     Prior to purchasing a MoviePass Subscription, Mrs. Weinberger visited MoviePass's homepage, on which she saw Defendant's representation that its Subscription service would provide access to tickets to "any movie" in "any theater" on "any day."

25.     Prior to purchasing a MoviePass Subscription, Mrs. Weinberger also saw Defendant's representation that a MoviePass Subscription would provide her with "unlimited" access to tickets to movies in theaters.

26.     Prior to purchasing a Subscription, Mrs. Weinberger believed that a Subscription would provide her access to tickets to "any movie" in "any theater" on "any day," up to one movie per day. She believed she could use the Subscription to obtain "unlimited" tickets to movies in theaters, up to one movie per day.

27.     Mrs. Weinberger relied upon Defendant's "any theater, any movie, any day" representation and its "unlimited" representation in making her decision to purchase a full year MoviePass Subscription for $105.35, and she would not have purchased the Subscription had she known that, in fact, the Subscription would not provide her with access to "any movie" in "any theater" on "any day" and would not provide her with "unlimited" access to tickets, and that, instead, she would routinely be unable to obtain access to Subscription-based tickets to any movie playing in a theater.

28.     Mrs. Weinberger paid for a MoviePass Subscription that provided access to "any movie" in "any theater" on "any day" and provided "unlimited" access to tickets, but she received a Subscription that did not provide her access to "any movie" in "any theater" on "any day" or "unlimited" access to tickets. Rather, the Subscription Mrs. Weinberger received routinely failed to provide her access to tickets to any movie playing in a theater.

29.     The MoviePass Subscription that Mrs. Weinberger received was worth less than

5

the Subscription for which she paid. Mrs. Weinberger was injured in fact and lost money as a result of Defendant's improper conduct.

30.     As of February 1, 2019, Mrs. Weinberger has seen a total of three movies using her MoviePass Subscription: one in May 2018, one in July 2018, and one in October 2018.

31.     On numerous occasions, Mrs. Weinberger was unable to see any movie using MoviePass, although she tried to do so. When she searched for tickets using the MoviePass App, the App would require Mrs. Weinberger to select potential theaters. After she had selected theaters, the App would state that "there are no more screenings at this theater today," even when Mrs. Weinberger had selected up to four potential theaters. The MoviePass App routinely gave Mrs. Weinberger the message "there are no more screenings at this theater today" in response to her searches at various times throughout the day, including early morning, mid-morning, afternoon, and evening.

32.     Mrs. Weinberger could not obtain a refund if she attempted to cancel her Subscription prior to the end of the one year period because MoviePass does not offer pro-rated refunds to annual subscribers.

33.     Mrs. Weinberger would purchase another "unlimited" MoviePass Subscription in the future, if it were true that the Subscription would provide her with unlimited access to tickets to movies in theaters, i.e., access to tickets to any movie in any theater on any day. At present, however, Mrs. Weinberger cannot be confident that a MoviePass Subscription would provide her with "unlimited" access to tickets to movies in theaters or with the ability to purchase tickets to "any movie" in "any theater" on "any day."

**Defendant MoviePass Inc.**

34.     MoviePass Inc. is a corporation organized under the laws of Delaware.

35.     MoviePass Inc.'s principal executive office is located at 175 Varick Street, 6th Floor, New York, New York, 10014.

## JURISDICTION AND VENUE

### Jurisdiction

36.     This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: Plaintiffs' claims arise out of Defendant's conduct within New York, including Defendant's conduct of disseminating in New York false and misleading representations that MoviePass Subscriptions would provide "unlimited" access to tickets to movies in theaters and that Subscriptions would provide tickets to "any movie" in "any theater" on "any day."

37.     This Court has original subject matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiffs bring claims on behalf of a nationwide class and Defendant is a citizen of Delaware and New York, at least one member of the plaintiff class is a citizen of a State different from Defendant. Further, Plaintiffs allege the matter in controversy is well in excess of $5,000,000 in the aggregate, exclusive of interest and costs. Finally, Plaintiffs allege "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

### Venue

38.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because

MoviePass, the sole defendant, resides in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS

39.     Film marketing executive and producer Stacy Spikes co-founded MoviePass, a subscription-based discount movie ticket service, with entrepreneur Hamet Watt in 2011.

40.     To obtain a MoviePass Subscription, a consumer must create an account on Defendant's homepage, www.moviepass.com, and provide information including a name and address. Within around 5 to 7 business days, MoviePass will then mail the consumer a MoviePass Card, which looks like a credit or debit card.

41.     To use the Subscription, the consumer must activate the MoviePass Card and download the MoviePass App on their smartphone or other electronic device. The consumer may then browse available theaters, movies, and showtimes on the App. If the consumer finds a theater, movie, and showtime on the App, the consumer then travels to the theater, checks in to the showtime on the App, and uses the MoviePass Card to purchase a ticket. The consumer may also, alternatively, purchase an electronic ticket (e-ticket).

42.     MoviePass has offered at least three types of recurring Subscriptions: month-to-month, quarterly, and annual.

43.     Generally, MoviePass has billed consumers when they obtain their Subscriptions and subsequently on a recurring basis until either MoviePass or the consumer terminates the Subscription.

44.     If a consumer cancels a Subscription prior to the end of the billing period, MoviePass does not refund the consumer any portion of the money for that billing period, even in the case of subscribers who prepaid for a full quarter or a full year.

**Defendant Advertises and Markets the Subscriptions**
**as Providing "Unlimited" Access to Tickets to Movies in Theaters**
**and as Allowing Consumers to Purhase Tickets to**
**"Any Movie" in "Any Theater" on "Any Day"**

45.     During the period from February 1, 2013, to August 5, 2018, MoviePass systematically marketed and advertised the MoviePass Subscriptions throughout the United States as providing consumers with "unlimited" access to tickets to movies playing in theaters, or with the ability to purchase a ticket to "any movie" in "any theater" on "any day," such that any United States consumer who purchased a MoviePass Subscription was exposed to Defendant's claim that the MoviePass Subscriptions provide unlimited access to tickets to movies playing in theaters, on any day.

46.     Indeed, from 2011, the year MoviePass was founded, until August 5, 2018, Defendant advertised that its Subscriptions provide "unlimited" access to tickets to movies in theaters or that the Subscriptions would allow consumers to purchase tickets to "any movie" in "any theater" on "any day."

47.     As the screenshot below from the Internet Archive WayBack Machine shows, on December 28, 2011, the MoviePass homepage stated that the company provided access to "Unlimited Movies IN THEATERS NATIONWIDE."



Internet    Archive    WayBack    Machine,    www.moviepass.com    (Dec.    28,    2011), https://goo.gl/nB6h8P.

48.    As the screenshot below shows, Defendant continued to represent that its Subscriptions provided "unlimited" access to movies in theaters in 2012.



Internet Archive WayBack Machine, www.moviepass.com (Jan. 12, 2012), https://goo.gl/m4fJCr; *see also* Internet Archive WayBack Machine, www.moviepass.com (May 2, 2012), https://goo.gl/Q1jurr.

11

49.    In 2013, Defendant continued to claim that MoviePass subscribers enjoy "UNLIMITED" movies in theaters nationwide, as shown below.



Internet Archive WayBack Machine, www.moviepass.com/splashes (Apr. 25, 2013), https://goo.gl/uq9BZT (redirected from www.moviepass.com); *see also* Internet Archive WayBack Machine, www.moviepass.com/spd (Aug. 29, 2013), https://goo.gl/5RHpwc (redirected from www.moviepass.com).

50.    On July 12, 2014, Defendant's homepage indicated its Subscriptions allow access to tickets to "ALL MAJOR MOVIES" in "ALL MAJOR THEATERS" with "NO BLACKOUT DATES" and stated that consumers could "[s]ee a new 2D movie every 24 hours" and could "even go on opening night!", as shown in the screenshot below.



Internet Archive WayBack Machine, www.moviepass.com (July 12, 2014), https://goo.gl/t4jT9A; *see also* Internet Archive WayBack Machine, www.moviepass.com (Oct. 6, 2014),

https://goo.gl/WAmuxJ (also indicating Subscriptions allow access to "Unlimited" movies in theaters nationwide for "[o]ne low monthly fee").

51.    On February 25, 2015, Defendant's homepage again claimed its Subscriptions allowed access to "UNLIMITED" movies in theaters.



Internet    Archive    WayBack    Machine,    www.moviepass.com    (Feb.    25,    2015), https://goo.gl/eevUA5; *see also* Internet Archive WayBack Machine, www.moviepass.com (Nov. 21, 2015), https://goo.gl/ge2KwS.

52.     Defendant made the same claims in 2016:



Internet    Archive    WayBack    Machine,    www.moviepass.com    (Mar.    22,    2016),

https://goo.gl/AfZi9q; *see also* Internet Archive WayBack Machine, www.moviepass.com (Nov.

23, 2016), https://goo.gl/HAofy7.

53.     Defendant continued to make the same claims in 2017 as well. Internet Archive

WayBack Machine, www.moviepass.com (July 3, 2017), https://goo.gl/RCeXin.

54.     On October 24, 2017, Defendant's homepage indicated that a MoviePass Subscription allows access to tickets to "ANY MOVIE ANY THEATER ANY DAY":



Internet Archive WayBack Machine, www.moviepass.com (Oct. 24, 2017), https://goo.gl/Lc61AJ.

55.     Similarly, on January 1, 2018, MoviePass offered access to "Any Movie Any Theater Any Day." Internet Archive WayBack Machine, www.moviepass.com (Jan. 1, 2018), https://goo.gl/Xq96sg.

16

56.     MoviePass made the same claims on February 3, 2018. Internet Archive WayBack
Machine, www.moviepass.com (Feb. 3, 2018), https://goo.gl/fqTM6y.

57.     As the screenshot below shows, as of February 11, 2018, MoviePass offered access
to "Any Movie, Any Theater, Any Day," as well as "Unlimited streaming of Fandor's library of
5,000+ movies," for $7.95 per month to first time subscribers who paid for a full year.



Internet   Archive   WayBack   Machine,   www.moviepass.com   (Feb.   11,   2018),
https://goo.gl/vU6tqm.

58.    As shown below, on February 24, 2018, MoviePass offered "Unlimited" access to
movies in theaters for $7.95 per month to first time subscribers who purchased a year Subscription.



Internet   Archive   WayBack   Machine,   www.moviepass.com   (Feb.   24,   2018),
https://goo.gl/bQzopk.

59.     By March 2, 2018, MoviePass had added a $9.95 "processing fee" to its offer of "unlimited" access, for a total of $105.35 at the time of purchase, as shown below.



Internet    Archive    WayBack    Machine,    www.moviepass.com    (Mar.    2,    2018),
https://goo.gl/9d8Xmk.

60.     On August 6, 2018, Defendant sent an email to MoviePass subscribers, including Plaintiffs, with the subject "Please Read: Updates to your MoviePass Plan," in which it announced

a new service plan in which Subscription holders would only be able to purchase tickets to up to three movies per month through their Subscriptions. The email stated that "[q]uarterly and annual subscribers will not be impacted until their renewal date."

61.     As the foregoing paragraphs illustrate, Defendant's marketing and advertising of the MoviePass Subscriptions unequivocally demonstrate its intent to persuade consumers that the Subscriptions provide "unlimited" access to tickets to movies in theaters and that the Subscriptions allow consumers to purchase a ticket to "any movie" in "any theater" on "any day."

62.     The representation that a MoviePass Subscription provides "unlimited" access to tickets to movies in theaters is material to a reasonable consumer.

63.     The representation that a MoviePass Subscription allows consumers to purchase a ticket to "any movie" in "any theater" on "any day" is material to a reasonable consumer.

64.     Defendant recognizes a consumer desire to see movies in theaters more often, at a discount price per ticket.

65.     According to ConsumerAffairs, Defendant's Chief Executive Officer Mitch Lowe has stated:

> "After years of studying and analysis, we found that people want to go to the movies more often, but the pricing keeps going up, and that prevents them from going more. We're making it more affordable for people."

Gary Guthrie, *MoviePass changes its subscription plan once again: Subscribers say they're tired of the 'bait and switch'*, WWW.CONSUMERAFFAIRS.COM (July 6, 2018), https://goo.gl/5yvhy8.

66.     Defendant is well aware that claims that a MoviePass Subscription provides "unlimited" access to tickets to movies in theaters are material to consumers.

67.     Defendant is well aware that claims that a MoviePass Subscription allows consumers to purchase a ticket to "any movie" in "any theater" on "any day" are material to

consumers.

68.     Defendant markets and advertises the MoviePass Subscriptions as providing "unlimited" access to tickets to movies in theaters, and as allowing consumers to purchase a ticket to "any movie" in "any theater" on "any day," to increase Subscription sales.

### Defendant Did Not Provide "Unlimited" Access to Tickets to Movies in Theaters and Did Not Enable Consumers with MoviePass Subscriptions to Purchase Tickets to "Any Movie" in "Any Theater" on "Any Day"

69.     Defendant's claims are false and misleading because MoviePass did not provide "unlimited" access to tickets to movies playing in theaters and it did not provide access to tickets to "any movie" in "any theater" on "any day."

70.     Rather, Plaintiffs and the Class members routinely were unable to access tickets to any movies playing in theaters; were prohibited from purchasing tickets to certain movies through their Subscriptions; were offered only limited movie selection, theater selection, and showtime selection; and otherwise experienced significant difficulties in obtaining access to tickets to movies through their Subscriptions.

71.     When Subscription holders, including Plaintiffs and the Class members, search for movie tickets and theaters using the MoviePass App, the App routinely states that "there are no more screenings at this theater today," regardless of the time of day at which the Subscription holder conducts the search.

72.     The App also routinely limits the available movies, showtimes, and theaters for which Subscription holders can purchase tickets, making it difficult to take advantage of the Subscription service.

73.     Additionally, in April 2018, MoviePass began prohibiting repeat viewings of the same movie, thereby introducing another limit to its Subscription service and falsifying for an

21

additional reason its promises to provide "unlimited" access to movie tickets and to provide access to "any movie" in "any theater" on "any day."

74.     In July 2018, Defendant's CEO Mitch Lowe admitted that "certain movies may not always be available in every theater on our platform." Gary Guthrie, *MoviePass borrows an emergency $5 million to keep its service alive: The company continues to add caveats to its all-you-can-watch model*, WWW.CONSUMERAFFAIRS.COM (July 30, 2018), https://goo.gl/wkXXvk.

75.     In July 2018, ConsumerAffairs reported that MoviePass "continue[d] to add caveats to its all-you-can-watch model," including surge pricing and the company declining to allow Subscription holders to purchase tickets to the new Tom Cruise movie ("Mission: Impossible – Fallout") through their Subscriptions, and that Subscription holders were having to deal with MoviePass Card outages due to Defendant's failure to pay its card payment processors. *Id.*

76.     On July 30, 2018, Business Insider reported that MoviePass would be blocking members from using its Subscription service to see major upcoming releases, including "Christopher Robin" and "The Meg." Jason Guerrasio, *MoviePass CEO announces in all-hands meeting that tickets to big upcoming movies will not be available on the app*, WWW.BUSINESSINSIDER.COM (July 30, 2018, 5:15 PM), https://goo.gl/GHsaap. According to Business Insider:

> A source familiar with the matter told Business Insider that during an all-hands meeting on [July 30, 2018], MoviePass CEO Mitch Lowe said the app would not make "Christopher Robin" and "The Meg" — the two major releases hitting theaters in the next two weeks — available to its subscribers, and he implied that the practice of not offering tickets to major movies would continue for the foreseeable future.

*Id.*

77.     In August 2018, MoviePass CEO Mitch Lowe wrote an email to Subscription holders that admitted, "We know that at times, the frequent changes to our service have been

frustrating to you." Gary Guthrie, *MoviePass decides on a plan that should solve its woes: The big questions are whether the plan is sustainable and if consumers will stay onboard*, WWW.CONSUMERAFFAIRS.COM (Aug. 7, 2018), https://goo.gl/63qWRe.

78.     In the August 2018 email, Mr. Lowe stated that 85 percent of Subscription holders only saw three movies or less per month. *Id.*

79.     While in the August 2018 email, Defendant's CEO interpreted the 85 percent figure as indicating that Subscription holders do not want to see more than three movies per month, *id.*, Plaintiffs believe the truth is that most MoviePass Subscription holders, like Mr. and Mrs. Weinberger, were not able to find tickets to more than three movies per month using the MoviePass App due to routine messages that "there are no more screenings at this theater today" and due to limitations on movie selection, showtime selection, and theater selection.

80.     In August 2018, ConsumerAffairs reported the complaints of one Subscription holder as follows:

> "This is why I canceled #MoviePass. The constant spin & utter lack of accountability for ANYTHING. You offered an impossible deal, people took advantage of it, now it's 'unfair' that they did so. I'm happy over at AMC A-List, which MoviePass mocked, now offering 4x the movies," tweeted film critic Dan Murrell.

Gary Guthrie, *MoviePass decides on a plan that should solve its woes: The big questions are whether the plan is sustainable and if consumers will stay onboard*, WWW.CONSUMERAFFAIRS.COM (Aug. 7, 2018), https://goo.gl/63qWRe.

81.     An August 6, 2018, online poll indicated that 52% of consumers planned to cancel their Subscriptions after MoviePass announced (on the same day) that Subscriptions would only provide access to tickets to three movies per month instead of the "unlimited" access that Defendant previously promised; the screenshot below shows the results.



*Now that MoviePass is $9.95 for 3 movies what will you do?*, WWW.STRAWPOLL.ME (Aug. 6, 2018), https://www.strawpoll.me/16224012/r.

82.     On August 10, 2018, the New York Post reported that MoviePass had limited its Subscription movie selection to a mere two movies per day, a far cry from the "unlimited" access it had promised. Nicolas Vega, *MoviePass now forcing users* to choose between two movies a day, NYPost.com (Aug. 10, 2018), https://goo.gl/H3SDX9.

83.     In the same article, the New York Post also reported that the MoviePass

Subscription service had crashed for three weekends in a row, that the quality of one of the two movies then offered was poor, and that one of the showtimes then offered was inconvenient. *Id.* ("The app crash came just hours after the company quietly rolled out its latest ploy to keep users from heading to the theaters: forcing them to choose between a terrible film and a terrible showtime.").

84.     Consumers have complained online about Defendant's failure to adhere to its "unlimited" and "any theater, any movie, any day" representations. For example, one unhappy consumer wrote in an online forum concerning MoviePass:

> MOVIEPASS! No Movie - No Theater - Every Day
>
> Hi! so I'm trying to figure out (if at all) how I can actually use the service I had subscribed for? I had signed up for the yearly enrollment which was advertised as unlimited movies with restriction of one movie per day and no special screenings. This soon turned into "We want you to explore different movies" ie. one movie once which I had no issue with . . . then you guys asked to upload ticket stubs which I adhered to. Then you guys started marking international movies as premier and excluding those even though they were the exact same price as any other movie in the same theater around the same time . . . this did not make sense to me. Now rcently you said no blockbuster movies just so you can keep the cost down and blocking most of the newly released movies which kind of beats the purpose of what Moviepass was set out to be . . . . but fine. I really don't mind waiting a week or two watch the movie hence didn't have a issue with this too but now it's at a point where by the time I get out of work on weekdays, all the theaters near my house don't have any screening for any movies. On weekends the only way to get a ticket is to go to the theater early afternoon else it's the same case "No screening for the rest of the day" So I'm just trying to figure out how do you expect me to use the service? Sure your CEO can send communication out saying you are trying to be transparent but can you guys include the fact that user can't really reserve any shows for any movies by evening everyday? or as your automated system responds asking to stick to theaters that support e-ticketing and not the large number of theater the service had initially advertised? Just trying to figure out what the expectation is just so I don't feel let down yet again when I open your app! Thanks!

*MOVIEPASS! No Movie - No Theater - Every Day*, WWW.REDDIT.COM/R/MOVIEPASS (Aug. 9, 2018), https://goo.gl/SyZi1P.

85.     For all of these reasons, Defendant misled, deceived, and confused reasonable

consumers, including Plaintiffs and the Class members, by portraying the MoviePass Subscriptions as allowing "unlimited" access to tickets to movies playing in theaters and as providing access to tickets to "any movie" in "any theater" on "any day," when, in truth, the Subscriptions did not provide "unlimited" access to tickets to movies playing in theaters and did not provide access to tickets to "any movie" in "any theater" on "any day."

86.    Defendant's conduct harmed consumers by inducing them to purchase MoviePass Subscriptions on the false premise that the Subscriptions would allow them "unlimited" access to tickets to movies playing in theaters, and the false premise that the Subscriptions would allow them to purchase tickets to "any movie" in "any theater" on "any day," when the consumers would not have otherwise purchased the Subscriptions, and by inducing consumers to pay a higher price for the Subscriptions than they otherwise would have been willing to pay.

87.    MoviePass refuses to provide pro-rated refunds to Subscription holders who cancel their Subscriptions prior to the end of the Subscription period, regardless of whether the Subscription is a monthly Subscription, a quarterly Subscription, or a yearly Subscription.

88.    Furthermore, on September 28, 2018, MoviePass sent the email quoted below to a "select" group of former customers who had allowed their Subscriptions to lapse and who, as a result, were no longer paying MoviePass subscribers:

> In August 2018, we announced a new offering for three movies a month for $9.95, giving subscribers the ability to opt-in to this plan if they wanted to continue as a MoviePass subscriber. However, our records show that you have not yet taken any action on the new plan, and because of that your subscription was suspended and your monthly subscription charges have stopped.
>
> Because we really hope you begin enjoying your MoviePass subscription again, we have chosen you to be a part of a select test group, who beginning Friday, October 5th will be restored to unlimited movies (up to one new movie title per day based on existing inventory) – the same subscription that you signed up for and you previously enjoyed. If you decide that you do not want this you must "opt out" before Thursday, October 4th at 9:00PM ET.

To be clear, unless you opt out, your unlimited subscription will be restored and you will begin enjoying unlimited movies again (up to 1 movie per day, based on existing inventory) at $9.95 per month, and your credit card on file will be charged on a monthly basis beginning Friday, October 5th, 2018.

If you do opt out of the restoration of your subscription to the unlimited plan, your subscription will be canceled and no longer held in a "suspended" status, and you will not be able to re-join until 9 months have passed.

In other words, if the former customers, who had allowed their Subscriptions to lapse, did not want to be charged again on a recurring basis, MoviePass demanded they proactively opt out of the plan that MoviePass had enrolled them in *without* their consent, within less than a week. Nick Statt, *MoviePass is now forcing former users to opt out of new plan or risk being charged*, WWW.THEVERGE.COM (Sept. 28, 2018, 7:27pm EDT), https://goo.gl/Y3RbEr; *see also* Gary Guthrie, *MoviePass tries to 'restore' users' accounts without permission*, WWW.CONSUMERAFFAIRS.COM (Oct. 2, 2018), https://goo.gl/2BVfMP.

### Plaintiffs and the Class Members Reasonably Relied on Defendant's Misrepresentations

89.     Plaintiffs and the Class members reasonably relied to their detriment on Defendant's false and misleading "unlimited" and "any movie, any theater, any day" representations and omissions.

90.     Defendant's misleading affirmative statements that the Subscriptions would provide "unlimited" access to tickets to movies in theaters and that the Subscriptions would allow consumers to purchase tickets to "any movie" in "any theater" on "any day" obscured the material facts that Defendant failed to disclose, i.e., that the Subscriptions would not in fact provide Plaintiffs and the Class members with "unlimited" access to tickets to movies in theaters or with the ability to purchase tickets to "any movie" in "any theater" on "any day."

91.     Defendant's false and misleading representations and omissions are likely to

deceive and mislead reasonable consumers and the general public again in the future, as they have already deceived and misled Plaintiff and the Class members.

**Defendant's Wrongful Conduct Caused Plaintiffs' and the Class Members' Injuries**

92.     As an immediate, direct, and proximate result of Defendant's false and misleading representations and omissions, Defendant injured Plaintiffs and the Class members in that they:

      a.     paid a sum of money for Subscriptions that were not what Defendant represented;

      b.     were deprived of the benefit of the bargain because the Subscriptions they purchased were different from what Defendant promised;

      c.     were deprived of the benefit of the bargain because the Subscriptions they purchased had less value than what Defendant represented;

      d.     did not receive Subscriptions that measured up to their expectations, which Defendant created; and

      e.     were denied the benefit of the "unlimited" discount movie tickets, on "any day" to "any movie" in "any theater," which Defendant promised.

93.     Had Defendant not made the false and misleading representations and omissions, Plaintiffs and the Class members would not have been willing to pay the same amount for the Subscriptions they purchased, and, consequently, Plaintiffs and the Class members would not have been willing to purchase the Subscriptions.

94.     Plaintiffs and the Class members paid for Subscriptions that allowed "unlimited" access to tickets to movies in theaters and that would allow them to purchase tickets to "any movie" in "any theater" on "any day" but received Subscriptions that did not in fact allow them "unlimited" access to tickets to movies in theaters and that did not in fact allow them to purchase tickets to "any movie" in "any theater" on "any day."  The Subscriptions Plaintiffs and the Class members received were worth less than the Subscriptions for which they paid.

95.     Based on Defendant's false and misleading representations, Defendant was able to,

and did, charge Plaintiffs and the Class members a higher price for the Subscriptions than Defendant would have otherwise been able to charge had Defendant not made the "unlimited" and "any movie, any theater, any day" representations.

96.     Plaintiffs and the Class members all paid money for the MoviePass Subscriptions. However, Plaintiffs and the Class members did not obtain the full value of the advertised Subscriptions due to Defendant's false and misleading representations. Plaintiffs and the Class members purchased more of, or paid more for, the Subscriptions than they would have had they known the truth about the Subscriptions. Consequently, Plaintiffs and the Class members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ACTION ALLEGATIONS

97.     Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs brings this action on behalf of themselves and a proposed class defined as follows:

> **The Injunctive Relief Class.** All persons who purchased a MoviePass Subscription from Defendant during the period from February 1, 2013, to August 5, 2018.
>
> Plaintiffs ask the Court to adjudicate only liability, declaratory relief, and injunctive relief through the Injunctive Relief Class. The Injunctive Relief Class does not seek any form of monetary relief.
>
> Excluded from the Injunctive Relief Class are: (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Class in accordance with Court-approved procedures.

98.     Additionally, pursuant to Rule 23(a) and (b)(3), Plaintiffs bring this action on behalf of themselves and a proposed class defined as follows:

> **The Monetary Relief Class.** All persons who purchased a MoviePass Subscription from Defendant during the period from

February 1, 2013, to August 5, 2018.

Plaintiffs ask the Court to adjudicate all forms of relief through the Monetary Relief Class.

Excluded from the Monetary Relief Class are: (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Class in accordance with Court-approved procedures.

99.     Additionally, pursuant to Rule 23(a) and (b)(3), Plaintiffs bring this action on behalf

of themselves and a proposed subclass defined as follows:

**The New York Subclass.** All persons who purchased a MoviePass Subscription from Defendant in New York during the period from February 1, 2013, to August 5, 2018.

Plaintiffs ask the Court to adjudicate all forms of relief through the New York Subclass.

Excluded from the New York Subclass are: (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Class in accordance with Court-approved procedures.

100.    Collectively, the Injunctive Relief Class, the Monetary Relief Class, and the New

York Subclass are the "Class."

101.    Plaintiffs reserve the right to alter the Class definitions as they deem necessary at

any time to the full extent that the Federal Rules of Civil Procedure, the Local Rules of the United

States District Courts for the Southern and Eastern Districts of New York, and applicable precedent

allow.

102.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because

Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

103.    Numerosity; Rule 23(a)(1): The size of the Class is so large that joinder of all Class members is impracticable. Due to the nature of Defendant's business, Plaintiffs believe there are millions of Class members geographically dispersed throughout the United States.

104.    Existence and Predominance of Common Questions of Law and Fact; Rule 23(a)(2), (b)(3): There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members.

105.    All Class members were exposed to Defendant's deceptive and misleading advertising and marketing claims that their MoviePass Subscriptions would provide them with "unlimited" access to tickets to movies in theaters and would allow them to purchase tickets to "any movie" in "any theater" on "any day."

106.    Furthermore, common legal and factual questions include but are not limited to:

a.      whether Defendant engaged in the course of conduct alleged herein;

b.      whether Defendant's conduct of marketing and advertising the MoviePass Subscriptions as providing "unlimited" access to tickets to movies in theaters and as allowing consumers to purchase tickets to "any movie" in "any theater" on "any day" is likely to deceive a reasonable consumer acting reasonably in the circumstances;

c.      whether Defendant's conduct constitutes an unfair or deceptive act or practice;

d.      whether Defendant violated the New York consumer protection statutes set forth below;

e.      whether Defendant breached its contracts with Plaintiff and the Class members by failing to provide them "unlimited" access to tickets to movies in theaters and by failing to allow them to purchase tickets to "any movie" in "any theater" on "any day";

f.    whether Defendant breached the implied covenant of good faith and fair dealing by failing to provide Plaintiff and the Class members with "unlimited" access to tickets to movies in theaters and by failing to allow them to purchase tickets to "any movie" in "any theater" on "any day";

g.    whether Plaintiff and the Class members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

h.    whether Plaintiffs and the Class members are entitled to injunctive relief or equitable relief, including equitable restitution.

107.    Defendant engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the Class members. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers that will materially advance the litigation.

108.    Typicality; Rule 23(a)(3): Plaintiffs' claims are typical of the claims of the Class members because Defendant injured all Class members through the uniform misconduct described herein; all Class members were subject to Defendant's false, misleading, and unfair advertising and marketing practices and representations, including the false and misleading claims that the MoviePass Subscriptions provided "unlimited" access to tickets to movies in theaters and that the Subscriptions would allow consumers to purchase tickets to "any movie" in "any theater" on "any day"; and Plaintiffs seek the same relief as the Class members.

109.    Furthermore, there are no defenses available to Defendant that are unique to Plaintiffs.

110.    Adequacy of Representation; Rule 23(a)(4): Each Plaintiff is a fair and adequate representative of the Class because each Plaintiff's interests do not conflict with the Class

members' interests.

111.   Plaintiffs have selected competent counsel that are experienced in class action and other complex litigation.

112.   Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendant. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

113.   Injunctive or Declaratory Relief; Rule 23(b)(2): The requirements for maintaining a class action pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

114.   Superiority; Rule 23(b)(3): The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

     a.   The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct.

     b.   It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. Individualized litigation would unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

     c.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant.

        d.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

115. <u>Notice</u>: Plaintiffs and their counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CLAIMS

### FIRST CLAIM

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act**
**N.Y. GEN. BUS. LAW § 349**
**On Behalf of the Class**

116. Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

117. Plaintiffs bring this claim on behalf of the Class for violation of New York General Business Law section 349.

118. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. GEN. BUS. LAW § 349(a).

119. Defendant's marketing and advertising of the MoviePass Subscriptions, as alleged herein, constitute "deceptive" acts and practices, and such conduct would mislead a reasonable consumer acting reasonably in the circumstances. As discussed above, Defendant's marketing and advertising of the MoviePass Subscriptions misled Plaintiffs and the Class members as to whether the Subscriptions provided "unlimited" access to tickets to movies in theaters and as to whether the Subscriptions would allow Plaintiffs and the Class members to purchase tickets to "any movie" in "any theater" on "any day."

120.    In accordance with subsection (h) of section 349, Plaintiffs seek an order enjoining Defendant from continuing the unlawful deceptive acts and practices discussed above. Absent enjoining the unlawful deceptive acts and practices, Defendant will continue its false and misleading marketing of MoviePass Subscriptions and, in doing so, irreparably harm each of the Class members.

121.    As a consequence of Defendant's deceptive acts and practices, Plaintiffs and the Class members suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and the Class members seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 349(h).

122.    Therefore, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act**
**N.Y. GEN. BUS. LAW § 350**
**On Behalf of the Class**

123.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

124.    Plaintiffs bring this claim on behalf of the Class for violation of New York General Business Law section 350.

125.    Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. GEN. BUS. LAW § 350.

126.    New York General Business Law section 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. GEN. BUS. LAW § 350-a(1).

127.　Section 350-a also provides that advertising can be false by omission, as it further states that "[i]n determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." *Id.*

128.　Defendant's marketing and advertising of the MoviePass Subscriptions, as alleged herein, are "misleading in a material respect," and thus "false advertising," as they falsely represent that the Subscriptions provide "unlimited" access to tickets to movies in theaters and that the Subscriptions allow Subscription holders to purchase tickets to "any movie" in "any theater" on "any day." Defendant's marketing and advertising of the MoviePass Subscriptions, as alleged herein, would mislead a reasonable consumer acting reasonably in the circumstances.

129.　Plaintiffs seek an order enjoining Defendant from continuing this false advertising. Absent enjoining Defendant's false advertising of the MoviePass Subscriptions, Defendant will be free to continue its false and misleading "unlimited" and "any theater, any movie, any day" representations.

130.　As a direct and proximate result of Defendant's violation of New York General Business Law section 350, Plaintiffs and the Class members have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and the Class members also seek actual damages or statutory damages of $500, whichever is greater, as well as three times actual damages if the court finds Defendant willfully or knowingly violated section 350 and punitive damages. N.Y. GEN. BUS. LAW § 350-e(3).

131.    Therefore, Plaintiffs pray for relief as set forth below.

## THIRD CLAIM

### Breach of Contract
### On Behalf of the Class

132.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

133.    Plaintiffs bring this claim on behalf of the Class for breach of contract under New York common law.

134.    Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages.

135.    Plaintiffs and the Class members, on the one hand, and Defendant, on the other, formed an agreement concerning the MoviePass Subscriptions when Plaintiffs and the Class members purchased the Subscriptions from Defendant.

136.    Plaintiffs and the Class members performed all acts, conditions, covenants, and promises to be performed on their part when they paid for the MoviePass Subscriptions.

137.    Defendant unjustifiably, inexcusably, intentionally, and materially breached the contract described above by failing to perform its obligation under the contract, i.e., Defendant failed to provide Plaintiffs and the Class members with access to tickets to "any movie" in "any theater" on "any day" or with access to "unlimited" tickets to movies playing in theaters. Instead, Plaintiffs and the Class members routinely were unable to find tickets using the MoviePass App, were offered only tickets to a limited selection of movies in a limited selection of theaters on a limited selection of days, or experienced significant difficulties obtaining movie tickets through their Subscriptions, as discussed above.

138. As a result of Defendant's breach, Plaintiffs and the Class members were deprived of the benefit of the Subscription services for which they bargained and paid and, consequently, suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and the Class members seek compensatory damages or, alternatively, restitution.

139. Therefore, Plaintiffs pray for relief as set forth below.

### FOURTH CLAIM

**Breach of the Implied Covenant of Good Faith and Fair Dealing
On Behalf of the Class
In the Alternative to Plaintiffs' Claim for Breach of Contract**

140. Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

141. Plaintiffs bring this claim on behalf of the Class for breach of the implied covenant of good faith and fair dealing under New York common law, in the alternative to their claim for breach of contract set forth above.

142. Under New York law, the elements of a claim of breach of the implied covenant are (1) the existence of a duty, (2) breach of that duty, (3) causation, and (4) damages.

143. Under New York law, a covenant of good faith and fair dealing in the course of contract performance is implicit in all contracts.

144. The implied covenant of good faith and fair dealing obligates a promisor to fulfill any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract.

145. The implied covenant of good faith and fair dealing requires that neither party do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

146.     When a contract involves the exercise of discretion, the implied covenant of good faith and fair dealing prohibits the party with discretion from acting arbitrarily or irrationally in exercising that discretion.

147.     Implicit within any agreement that Plaintiffs and the Class members may have entered into with respect to their MoviePass Subscriptions is a covenant by Defendant to act in good faith and deal fairly with Plaintiffs and the Class members.

148.     Defendant breached this implied covenant of good faith and fair dealing by intentionally, knowingly, willfully, unreasonably, recklessly, arbitrarily, frivolously, and/or maliciously:

     a.     promoting MoviePass Subscriptions as providing "unlimited" access to tickets to movies in theaters and as providing access to "any movie" in "any theater" on "any day," but at the same time causing the MoviePass App to fail to provide such access to tickets;

     b.     refusing to offer full or partial refunds to customers who cancelled their Subscriptions prior to the end of the Subscription term; and

     c.     engaging in such other conduct to be disclosed in discovery.

149.     As a result of Defendant's conduct as described herein, Plaintiffs and the other Class members have suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and the Class members seek compensatory damages or, alternatively, restitution.

150.     Therefore, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court enter an Order:

A.     certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B. declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C. declaring that Defendant has committed the violations of law alleged herein;

D. providing for any and all injunctive relief the Court deems appropriate;

E. awarding statutory damages in the maximum amount for which the law provides;

F. awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G. providing for any and all equitable monetary relief the Court deems appropriate;

H. awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I. awarding Plaintiff its reasonable costs and expenses of suit, including attorneys' fees;

J. awarding pre- and post-judgment interest to the extent the law allows; and

K. providing such further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims set forth above that are so triable.


Date: February 1, 2019     Respectfully submitted,

        **REESE LLP**

      By: _/s/ Michael R. Reese_
        Michael R. Reese
        _mreese@reesellp.com_
        George V. Granade

*ggranade@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York  10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiffs and the Proposed Class*